[Cite as *State v. Lilliard*, 2013-Ohio-4906.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 99382, 99383, and 99385**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTHONY LILLIARD

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-563860, CR-559328, and CR-539327

**BEFORE:** Jones, J., Boyle, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** November 7, 2013

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Edward D. Brydle
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Anthony Lilliard appeals his aggravated robbery, kidnapping, and firearm specification convictions, which were rendered after a jury trial. We affirm.

## I. Procedural History

{¶2} Lilliard was indicted in three separate cases. In the first, Lilliard was charged with the kidnapping and aggravated robbery of Jerri Davis. The crimes were alleged to have occurred on or about January 5, 2012.

{¶3} In the second, Lilliard was charged with the kidnapping and aggravated robbery of Lisa Jackson. The crimes were alleged to have occurred on or about January 12, 2012.

{¶4} In the third, Lilliard was charged with the kidnapping and aggravated robbery of Yolanda Riley. The crimes were alleged to have occurred on or about January 19, 2012.

{¶5} Both counts in all three cases contained one- and three-year firearm specifications.

{¶6} Lilliard filed motions to suppress in all three cases, and after a hearing, the motions were denied. The state filed motions for joinder of the three cases, and after a hearing, the joinder motions were granted. The matter proceeded to a jury trial. At the conclusion of the state's case, the defense made a Crim.R. 29 motion for acquittal, which was denied. The defense rested without presenting evidence and renewed its Crim.R. 29 motion, that was again denied.

{¶7} The jury found Lilliard guilty of all counts and specifications. The trial court sentenced him to a total of five years on the underlying offenses in each case, to run concurrent. The trial court further sentenced Lilliard to a total of three years on each case for the firearm specifications. The firearm specifications were ordered to be served consecutive to each other and the sentences on the underlying charges. Lilliard, therefore, was sentenced to an aggregate 14-year prison term.

## II. Facts

Suppression Hearing

{¶8} In his suppression motions, Lilliard challenged the victims' identification of him and the procedure used for the identifications. The three victims testified at the hearing.

{¶9} Jerri Davis testified that at approximately 7:30 a.m. on the morning of the incident she was walking from her house to her car to go to work when a man came running across the street toward her with a gun and said "give me everything you got." Davis testified that it was light outside, and that she had the opportunity to see the robber's face because he was "right there" in front of her. Davis gave the robber her purse and work bag. During the incident, she fell to the ground. Davis testified that the robber then ran and fired his gun up in the air three times.

{¶10} Davis attempted to pursue him in her car, but was unsuccessful. She returned home and called the police, who responded to her home. Davis described the robber to the police as a short, dark-complected African American man with ears that

stuck out.

{¶11} Davis testified that she was contacted by a detective a few days later and went to the police station where she viewed two photo lineups. Davis testified that the detective who called her was not the detective who showed her the line-ups. The detective who presented the line-ups told her that "if you don't know who the person is, then you don't know who the person is."

{¶12} Davis did not make an identification from the first line-up, but did on the second line-up. According to Davis, she was in the room alone when she viewed the line-up and no one forced her or suggested anything to her to make her identification. Davis testified that "as soon as [she] got the [second line-up], [she] spotted the guy * * *." Davis identified Lilliard. Davis made an in-court identification of Lilliard as the man who had robbed her.

{¶13} Lisa Jackson testified that on the evening of the incident at approximately 6:20, she was unloading her car after work when a man approached her walking fast from her neighbor's yard and said "give me the money"; the man had a gun pointed at her. Jackson gave the man her purse. The man asked if the money was in her purse, to which Jackson responded "yes." The man told Jackson to lay on the ground until he left, which she did. The man started to leave, but then returned and asked Jackson what was in a lab jacket that she had; the man took the jacket and left. Jackson testified that she thought he was coming back to kill her because she had seen his face.

{¶14} Jackson testified that, although it was dark outside, she was able to see the

man because her interior car lights were on and her neighbor's motion detector flood light was also on — it had been activated when the man cut through the yard. Jackson described the robber as a "little, young boy," who reminded her of her son. She described him as sounding like a "young man," and told her husband that she got robbed by a "kid." Jackson testified that by "kid" and "little, young boy" she meant a 20-something young adult. She described the robber as being a dark-skinned African American, who was dressed mainly in black.

{¶15} Jackson testified that she called the police that evening and they responded to her home. She further testified that she did not give the police a description of the robber that evening because she was too nervous — she was concerned that because he knew where she lived he would return to retaliate.

{¶16} But her husband urged her to make an identification if she could and when the police asked Jackson to view a photo line-up she agreed. Jackson testified that a different detective from the one who asked her to view the line-up actually showed her the line-up. That detective told her to look at the line-up and see if she saw the man who robbed her. He told her he would give her a minute and then he walked away.

{¶17} Jackson testified that upon seeing the line-up it did not take her long to identify Lilliard because she quickly recognized that "little face." Jackson testified that she was "sure" about her identification. Jackson identified Lilliard in court as the man who had robbed her.

{¶18} Yolanda Riley testified that she was robbed at approximately 7:15 a.m. as

she was preparing to take her daughter to daycare. Riley testified that as she was walking from her home to her car, which was parked on the street right outside of her house, a man walked by and said "good morning, ma'am." Riley responded "good morning," and continued walking to her car. She testified that by the time she got to the driver's side door of car, "there was a gun in [her] face," and the man said "F that." Thinking that she was being carjacked, Riley attempted to give the man the keys to her car, but he started "wrestling" with her for her purse. Riley eventually let go of her purse and the man ran off with it.

{¶19} Riley testified that it was light outside when the robbery occurred and that she had an opportunity to look at his face when he said "good morning, ma'am,"and again when he approached with her the gun pointed in her face. She testified that "because of the neighborhood" she pays attention to people, "especially these young guys," as their demeanor is a "determining factor [if she] should really even come off [her] porch." She described the robber as a dark-skinned African American who was wearing a black "hoody" and jeans.

{¶20} Riley's mother called the police, who responded to the scene. A few days later, Riley went to the police to view a photo line-up. The investigating detective was not the same detective who presented the line-up. She was instructed by the detective presenting the line-up that if she was to make an identification she should circle the photograph of the person, but if she was not able to identify anyone that was "okay." Neither detective was in the room when Riley viewed the line-up. Riley picked Lilliard

from the line-up. She also identified him in court as the man who had robbed her.

{¶21} Based on the above testimony, the trial court ruled that the photo line-up from which the victims identified Lilliard was not unduly suggestive and the identification procedure was compliant with the statutory requirements. The suppression motions were therefore denied.

Trial Testimony

{¶22} In addition to the testimony of the victims presented at the suppression hearing as set forth above, the following additional victim testimony was elicited at trial.

{¶23} A recording of Davis's 911 call was played for the jury. On the recording, when asked for a description of the robber, Davis stated that she did not see his face. Davis admitted that in a subsequent interaction with the police she told them that she could not make an identification because she did not see his face. She testified, however, that her prior assertions that she did not see the robber's face were inaccurate; she did see his face.

{¶24} Davis maintained that she was not mistaken in her identification of Lilliard as the robber. She further maintained that she did not force herself to just pick anyone; to illustrate her point, she testified that she did not make an identification from the first line-up she viewed, and at the time she viewed the first line up she was not even aware that she was going to view a second line-up.

{¶25} A recording of Jackson's 911 call was also played for the jury. On the recording, Jackson told the dispatcher that she did not know what the robber was wearing.

When the police arrived, however, she told them that the robber was dressed in black. Jackson also testified that she looked "dead at" the robber.

**{¶26}** Other trial testimony presented by the state included that of Sergeant Arneil Rose. The sergeant testified that in late 2011 through early 2012 there had been a string of robberies in the Lee-Harvard area of Cleveland. He responded to at least three of the robberies, which occurred at approximately 7:30 in the morning, and the suspect was described as a dark-complected African American male, dressed in black and carrying a handgun. Sergeant Rose responded to the dispatch calls in which Davis and Riley were the victims.

**{¶27}** In regard to the January 5, 2012 robbery of Davis, Sergeant Rose testified that it had snowed the night before into the early morning so the ground was covered with fresh snow. Rose and his partner followed the footprints from Davis's home, and they led him to the side door of 15601 Invermere Avenue, a home in the Lee-Harvard area. Rose knocked on both the side and front doors but did not get a response.

**{¶28}** Regarding the January 19, 2012 robbery of Yolanda Riley, Rose was not able to track snowprints but he went back to the house at 15601 Invermere Avenue on a "hunch." When Rose arrived there, he observed "fresh footprints going up the driveway to the side door." He knocked on the door; his partner saw the blinds or curtains move, but no one answered the door.

**{¶29}** The sergeant prepared a "detail" for the area, which meant that extra manpower would be assigned to monitor the area, including an unmarked police vehicle.

The "detail" also consisted of monitoring 15601 Invermere Avenue.

**{¶30}** Sergeant Rose learned from the mailman that Eric Bullock resided at the house. He obtained a picture of Bullock and saw that he did not meet the description of the robber, but still turned the information over to the detective bureau.

**{¶31}** Eric Bullock, who was Lilliard's friend, reluctantly testified for the state. In January 2012, Bullock was living at the Invermere Avenue house, which his mother had been renting, because his mother had moved out, but wanted someone to live there to keep it safe from vandals. Bullock testified that he initially lived there with his girlfriend and their young child.

**{¶32}** Lilliard and Lilliard's girlfriend came to live with Bullock in the house in December 2011, and Bullock charged Lilliard rent, despite that he (Bullock) was not paying his mother rent. Bullock testified that in January 2012, Lilliard had not paid his rent, so Bullock told Lilliard that he needed to pay up and the two had "words."

**{¶33}** Bullock testified that one morning in January 2012, at approximately seven, he was awakened by a knock on the front door. Lilliard was already awake and heard the knock too. The two looked out the door and saw that it was the police. Bullock testified that he did not answer the door because his mother was not home, and Lilliard did not answer the door because he was of the philosophy "why answer the door for the police?" According to Bullock, he did "wonder" why the police where there, but he went back to sleep and forgot about it.

**{¶34}** The lead detective, Paul Burgio, testified that on January 25, 2012, he was

assigned to investigate six robberies that had occurred in the Lee-Harvard area. Without objection, the detective testified to his investigation into the cases. The six cases all had similar modes of operandi and possibly matching suspects. After putting the crimes in chronological order and making a map of the area where the crimes had occurred, the detective noted the following "interesting similarities": (1) four of the crimes occurred on a Thursday morning, (2) all of the victims were women over the age of 40, with two of the victims being elderly, and (3) they all occurred within a three-block radius.

{¶35} When he was assigned the case, Detective Burgio learned of the "detail" of the Invermere Avenue house and that Bullock resided there; he interviewed Bullock on January 25, 2012, the same day he was assigned the case. Burgio went to the house on Invermere and Bullock's mother answered the door and let him in. Burgio told Bullock of his investigation into the robberies; Bullock said he had no information.

{¶36} The detective gave Bullock a description of the suspect and asked if he knew anyone fitting the description; Bullock told him that he did not think so, but gave him the names of twin boys who lived down the street who maybe fit the description. The "lead" was "false"; the house where the twins supposedly lived was vacant.

{¶37} Bullock's testimony of the encounter differed, however. Bullock admitted that Detective Burgio specifically inquired of him whether anyone else lived with him. According to Bullock, the detective told Bullock that he (Bullock) fit the description of the suspected robber and that threw Bullock "for a loop" and he forgot to mention that Lilliard was living there. But Bullock did give the detective a "lead" — the names of

twins who lived down the street and had the same complexions as Bullock.

{¶38} As Bullock was testifying, he remembered that Lilliard had not, in fact, been living at the house at the time of the detective's visit. According to Bullock, right after the police initially came to the house (when the two did not answer the door), Bullock found a house for himself and was preparing to move, and Lilliard had made other arrangements and moved out.

{¶39} Officer Marvin Young also testified about the string of burglaries occurring in January 2012 in the Lee-Harvard area; at the time, the officer was assigned to patrol the area. While patrolling one day, Young learned that officers attempted to question a male who fit the description of the suspected robber; the male took off running and the police engaged in a foot chase, but eventually lost sight of the suspect. The suspect was later identified as Bullock.

{¶40} Later that same day, at the intersection of Lee Road and Invermere Avenue, Young saw a male jump into the backseat of a car. Young followed the car, radioed in the license plate, and activated his lights. He received information from dispatch that the vehicle had possibly been used in the area robberies.

{¶41} Young testified that as he approached the vehicle to effectuate the stop, the back seat passenger exited and ran. Young apprehended the driver, Bullock. Other officers attempted to locate the suspect who ran, but were unsuccessful. No gun was found in the car. The officer did not tell Bullock that a gun was found.

{¶42} On cross-examination, Officer Young admitted that two days prior to the

events he testified to, he had apprehended two other young black males in the Lee-Harvard area. One of the males was a juvenile who the officer returned home to his mother. The mother told Young that the other male her son had been with was probably "J," who was known to be committing aggravated robberies.

{¶43} Bullock also testified about the incident involving the car. At the time of the incident, Bullock had moved out of his mother's house, but was at the house when he had a telephone conversation with Lilliard. The two were trying to arrange a time for Bullock to come see Lilliard's new place. An hour or two later, Lilliard called Bullock and Bullock could immediately tell that something was "point blank wrong." Lilliard told Bullock that he was "at the top of the street."

{¶44} Bullock hung up the phone and "sped up the street" in his car. Bullock called Lilliard to see where he was, to which Lilliard responded, "here I come." Bullock then saw Lilliard, who "jumped" in the backseat of the car and told Bullock to "go." Bullock saw a police car stopped at the light on the opposite side of the street. He testified that he and the officer looked at each other.

{¶45} When Bullock started driving, the officer followed behind him and activated the cruiser's lights. Bullock "kept rolling a little bit" as he asked Lilliard if he had "anything" on him. Lilliard responded "no" and Bullock pulled over. Lilliard said "I'm gone" and got out of the car and "took off."

{¶46} Bullock told the police that an unknown man jumped in his car, put a gun to his head, and told him to go; he admitted at trial that that was a lie, and that he lied

because he was afraid because there were "60 or 70 police running up and down the street."

{¶47} According to Bullock, the police found a gun in the car, which Bullock denied was his. After the police told him about finding the gun, Bullock told the police that the passenger was Lilliard. Bullock was arrested on an outstanding warrant.

{¶48} Bullock testified that his mother had also been arrested on an unrelated matter and was in the jail with him. The police "paraded" her, crying, in front of him, when they were questioning him about the suspected robber. Bullock testified that the police showed him a line-up and asked if he knew anyone from it. Bullock testified that he knew two of the males — Lilliard and another male. When he indicated that he knew the other male, the police said that was not who they wanted, so he identified Lilliard.

{¶49} Bullock denied the incident earlier that day with the police, when the police said they attempted to speak with him and he ran away.

{¶50} Detective Burgio was the detective who got Bullock's identification of Lilliard as suspect. When the detective talked to Bullock, Bullock's mother had not yet been arrested and was not present at all.

{¶51} Lilliard turned himself in to the police, and Detective Burgio testified that he attempted to have Lilliard participate in an "old-fashioned stand-up lineup"[1] for two of the other robbery victims who were not the subjects of these cases. The detective

---

[1] An "old-fashioned stand-up lineup" is one where the victim views suspects live through a two-way glass, where the suspect cannot see the victim.

testified that Lilliard refused to go to the line-up and "cowered in the corner." The defense's objection was sustained as to the detective's description of Lilliard "cowering in the corner." Lilliard told the detective that he believed he was being set up and he did not do anything. Detective Burgio responded, over the defense's unsuccessful objection, that "[t]hey'll never identify you if you didn't do anything." The detective testified that Lilliard refused and "curled up in a ball in the corner" of his jail cell. Defense counsel objected to this and the court sustained the objection.

{¶52} On this testimony, the jury convicted Lilliard of all counts and specifications. Lilliard now raises the following assignments of error for our review:

[I.] The trial court erred by granting the state's motion to join the indictments in one trial which resulted in prejudice to appellant.

[II.] Appellant was denied due process when the trial court denied appellant's motion to suppress identification testimony.

[III.] Appellant was denied a fair trial and his Sixth Amendment rights were violated when other acts evidence was admitted at trial without objection.

[IV.] Appellant's convictions on firearm specifications were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal in each case.

[V.] The convictions were against the manifest weight of the evidence.

III.   Law and Analysis

Joinder of Indictments and "Other Acts" Evidence

{¶53} For his first assigned error, Lilliard contends that the trial court erred by granting the state's motion to join the indictments and that he suffered prejudice as a

result.   For his third assigned error, Lilliard contends that his counsel was ineffective for failing to object to "other acts" evidence.

{¶54} Crim.R. 8(A) governs joinder of offenses and provides:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶55} Further, Crim.R. 13 provides for joinder as follows:

The court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information.

The court may order two or more complaints to be tried together, if the offenses or the defendants could have been joined in a single complaint. The procedure shall be the same as if the prosecution were under such single complaint.

{¶56} The law generally favors joining multiple offenses in a single trial if the offenses charged are of the same or similar character.   *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).   However, if it appears that a defendant would be prejudiced by joinder, then the trial court is required to order separate trials.   Crim.R. 14.

{¶57} Prejudice is not demonstrated if one offense would have been admissible as "other acts" evidence under Evid.R. 404(B) or if the evidence of each crime joined at trial is simple and direct.   *Lott* at *id.*   If the evidence is used for purposes other than proving the accused acted in conformity with a particular character trait, Evid.R. 404(B) allows the admission of "other acts" evidence so long as it is "related to and shares common

features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus. Specifically, evidence of other crimes, wrongs, or acts is admissible under Evid.R. 404(B) if the evidence shows "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evidence of other crimes, wrong, or acts is inadmissible merely to show that an accused has the propensity to commit crime. Evid.R. 404(B).

{¶58} When a defendant claims that he was prejudiced by the joinder of multiple offenses, the trial court must determine (1) whether evidence of other crimes would be admissible even if the counts were severed and (2) if not, whether the evidence of each crime is simple and distinct. *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.*, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.1964).

{¶59} Lilliard cites this court's decision in *State v. Frazier*, 8th Dist. Cuyahoga No. 83024, 2004-Ohio-1121, in support of his contention that the trial court erred in granting the state's motion for joinder. We find that *Frazier* is not helpful to Lilliard for two reasons.

{¶60} First, this court held that an objection to joinder must be raised at some point *during trial* to preserve the issue for appellate review. *Id.* at fn. 4. Lilliard did not object to the joinder at all during trial. Thus, he has waived all but plain error review.

*State v. Hughes*, 8th Dist. Cuyahoga Nos. 98667 and 98668, 2013-Ohio-1550, ¶ 25.

**{¶61}** Under Crim.R. 52(B), notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *See also State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶62}** Second, the facts and circumstances in *Frazier* are distinguishable from here. In *Frazier*, the defendant was indicted in two separate cases of several sex-related offenses involving two child victims. In one case, the defendant was charged with crimes against Victim I alleged to have occurred in 1996. In the other case, the defendant was charged with crimes against Victim II alleged to have occurred in 2001 and 2002.

**{¶63}** This court addressed the particular delicacy with which "other acts" evidence in prosecutions for sexual offenses must be afforded:

> * * * the offenses in this case are highly inflammatory in nature. Sexually-related offenses elicit emotional outrage, even more so when those offenses involve children. This, combined with the fact that the offenses against each victim varied in degree and that the testimony by each victim was similar, the fact-finder would have a very difficult time looking at the evidence supporting each offense as simple and distinct because the temptation would be too great to respond to the evidence emotionally, rather than rationally.

*Id.* at ¶ 18.

**{¶64}** Victim I testified that the defendant raped her in 1996. Victim II testified that on an occasion in 2002 when she was sitting on a couch watching television, the defendant sat next to her, grabbed her arm, put his hand on her knee, and said "let's do

it." *Id.* at ¶ 6. Victim II declined, pushed the defendant away, and told him to leave, which he did. On this testimony, the jury convicted the defendant of the rape of Victim I and the attempted rape of Victim II.

{¶65} This court found that Victim I's testimony prejudiced the defendant because Victim II's testimony was not sufficient to demonstrate a "substantial step" toward rape that is required for attempted rape. *Id.* at ¶ 19. This court explained as follows:

> Had these offenses against each of the victims been tried separately and evidence of other acts appropriately limited, it is unlikely that appellant would have been convicted of attempted rape. Instead, the jury heard the details of the evidence supporting the charges of rape involving Victim I, and most likely, concluded that appellant had the propensity to commit the same crime against Victim II on evidence that would otherwise be insufficient to support a conviction for attempted rape.

*Id.*

{¶66} The charges here were not sex offenses against children. The charges here were also not separated by a five to six year time frame. Rather, law enforcement testified to the string of robberies in the area (which included other robberies not prosecuted in these cases) to set the background as to how these cases were investigated. The testimony was not offered to show that Lilliard had a propensity to commit crime. The testimony, therefore, would have been admissible even if each case had been tried separately. Moreover, each victim testified to a separate and distinct crime that Lilliard committed against her and, therefore, Lilliard was not prejudiced by the joinder of their cases.

{¶67} This case is more akin to *Hughes*, 8th Dist. Cuyahoga Nos. 98667 and

98668, 2013-Ohio-1550, which the state relies on for its contention that there was no plain error.

**{¶68}** In *Hughes*, the defendant was charged in one case with crimes associated with breaking and entering into a childcare center in Bedford in April 2011. In another case, the defendant was charged with crimes associated with breaking and entering into a Dunkin' Donuts in Bedford in June 2011. Both break-ins were captured on the business's security videos, and the defendant was identified as the perpetrator in both incidents.

**{¶69}** In finding that there was no plain error in the joinder of the two cases, this court stated the following:

> In the instant case, joinder was proper because the offenses are of similar nature and based on the same course of conduct. The evidence in each case was simple and direct, and there is no indication in the record that the jury confused the evidence as to the different counts or that it was influenced by the cumulative effect of the joinder. Both crimes were committed two months apart in the city of Bedford, both crimes were investigated by the same detective, and most importantly, both incidents were recorded on video surveillance cameras. * * * Thus, it cannot be said that [the defendant] was prejudiced by the joinder.

*Id.* at ¶ 27.

**{¶70}** Likewise, here, the offenses were of similar nature and based on the same course of conduct: all three women were robbed in January 2012 within a three-mile radius of one another in the Lee-Harvard area of Cleveland, when Lilliard approached them with a gun and demanded money. Further, the same detective investigated all three cases, and each victim's testimony was simple and direct and unequivocally implicated

Lilliard. On this record, we do not find plain error in the trial court's decision to grant the state's motion for joinder.

{¶71} The first assignment of error is therefore overruled.

{¶72} In addition to the evidence regarding each of the three victims in the three cases now before us, the state also presented testimony about three other robberies, and in the investigation into them, that occurred in the Lee-Harvard area around the same time as the robberies here. That "other acts" testimony is the subject of the third assignment of error, wherein Lilliard contends that his counsel was ineffective for not objecting to it.

{¶73} We review a claim of ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that his counsel's performance fell below an objective standard of reasonable representation; and if so, show there was a reasonable probability that his counsel's errors affected the outcome of the proceedings. *Id.* at paragraph two of the syllabus.

{¶74} The concern with "other acts" evidence is that other "bad acts" committed by a defendant other than the ones he is then being prosecuted for, if introduced, will show that a defendant has a propensity for "bad acts" or will be prejudicial to him.

{¶75} As previously mentioned, the testimony about the other three robberies was not presented to tie Lilliard to them. Rather, it was presented to show how the investigation in this case proceeded: the police were investigating a string of robberies of

women in the Lee-Harvard area in a small area, close in time, where the perpetrator, dressed in black, approached the victims with a gun and demanded money.

**{¶76}** The testimony of Detective Burgio about the attempted "old-fashioned stand-up lineup" for the victims not named in this case was ostensibly to explain why Lilliard was not charged with those crimes and, arguably, potentially problematic.[2] But defense counsel *did* object to that line of questioning, and the court sustained, at least in part, some of those objections. Regardless, even with the portions of the testimony that was admitted, it was not so prejudicial as to effect the outcome of the case. The victims were unequivocal in their identification of Lilliard and although his friend Bullock attempted to not implicate Lilliard, the state presented testimony tending to show that Bullock was less than truthful.

**{¶77}** In light of the above, the third assignment of error is overruled.

Suppression of Identification Testimony

**{¶78}** For his second assigned error, Lilliard contends that the trial court erred by not granting his motions to suppress the victims' pretrial identification of him.

**{¶79}** A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accordingly, we give deference to the trial judge's factual findings, but we review the application of law to fact de novo. *Id.*; *see also State v. Davis*, 8th Dist. Cuyahoga No. 83033,

---

[2]However, if the victims had identified Lilliard and he had been charged, there is a great likelihood that those cases would have been joined with these cases.

2004-Ohio-1908.

{¶80} Lilliard contends that the identification procedures did not comply with R.C. 2933.83. R.C. 2933.83 governs eyewitness identification procedures in lineups. Subsection (B)(1) of the statute provides in part that "[u]nless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup." A blind administrator "means the administrator does not know the identity of the suspect." R.C. 2933.83(A)(2). "If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is." R.C. 2933.83(B)(5).

{¶81} The suppression hearing consisted of the voir dire of the three victims. Each victim testified that a detective other than lead Detective Burgio presented the array to her, and that the detective administering the line-up left her alone to view the array, without any indication whatsoever as to who the suspect was. On this record, the identification procedures were compliant with the blind administrator requirement of R.C. 2933.83.

{¶82} Further, upon review, the line-ups were not unduly suggestive. The other men depicted in the arrays with Lilliard appeared relatively similar to him in age, features, skin tone, facial hair, dress, and photo background. *See State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶ 18.

{¶83} In light of the above, the second assignment of error is overruled.

Sufficiency of the Evidence

{¶84} In his fourth assignment of error, Lilliard contends that the evidence was insufficient to support the firearm specification convictions because (1) no weapons or casings were recovered from the robberies, (2) there was no evidence that any weapon was operable or capable of being used, and (3) Jackson testified that she did not know if the gun was fake or real.

{¶85} Our function when reviewing the sufficiency of the evidence is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶86} "[A] firearm penalty-enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." *State v. Thompkins*, 78 Ohio St.3d 380, 385, 678 N.E.2d 541 (1997). Thus, where an individual brandishes a gun and

implicitly, but not expressly, threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable. *Id.* at 384.

**{¶87}** "*Thompkins* clarifies that actions alone, without verbal threats, may be sufficient circumstances to establish operability of a firearm." *State v. Reynolds*, 79 Ohio St.3d 158, 679 N.E.2d 1131 (1997) (noting circumstantial evidence of two masked men waiving guns stating that they are committing a robbery was sufficient to sustain a firearm specification). *See also State v. Knight*, 2d Dist. Greene No. 2003 CA 14, 2004-Ohio-1941, ¶ 19 ("both a weapon's existence and its operability may be inferred from the facts and circumstances.").

**{¶88}** Furthermore, a victim's belief that the weapon is a gun, together with the defendant's intent to create and use the victim's belief for the defendant's own criminal purposes, is sufficient to prove a firearm specification. *See State v. Jeffers*, 143 Ohio App.3d 91, 757 N.E.2d 417 (1st Dist.2001) (sufficient evidence existed to support firearm specification when robbery defendant kept hand in pocket and told convenience store clerk that he would "blow [her] head off" if she did not comply); *State v. Obsaint*, 1st Dist. Hamilton No. C-60629, 2007-Ohio-2661 (defendant's written admission that he had a gun, in a note that made repeated references to shooting the teller, was sufficient circumstantial evidence to show that he possessed an operable firearm); *State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136 (sufficient evidence supported firearm specification even though the victim never saw the gun when the

defendant told the victim that he had a gun and that he would kill her and dump her body if she did not comply).

{¶89} The evidence here was sufficient to support the firearm specification convictions. All three women testified that Lilliard had a gun. Davis even testified that Lilliard shot the gun three times into the air as he ran away after the robbery. Moreover, although Jackson testified that she was not sure if the gun was real or fake, she nonetheless testified that Lilliard had a gun pointed at her, and when he returned for her lab jacket she thought he was going to kill her because she had previously seen his face. *See State v. Lott*, 9th Dist. Summit No. 22434, 2005-Ohio-3303, affirming firearm specification where defendant pointed gun at victims even though victims testified they did not know if gun was real or fake.

{¶90} In light of the above, the fourth assignment of error is overruled.

Weight of the Evidence

{¶91} For his final assigned error, Lilliard contends that the weight of the evidence did not support his convictions.

{¶92} When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380,

387, 678 N.E.2d 541. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶93}** In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶94}** This is not an exceptional case where the jury clearly lost its way. The three victims were robbed in the same neighborhood under the same circumstances. All three of them independently identified Lilliard as the robber.

**{¶95}** On this record, the fifth assignment of error is overruled.

**{¶96}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR