[Cite as *State v. Jones*, 2016-Ohio-5320.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 103359

---

## STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

## MARTREL D. JONES

### DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-592192-A

**BEFORE:** Kilbane, P.J., McCormack, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** August 11, 2016

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue - Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Daniel A. Cleary
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

{¶1}   Defendant-appellant, Martrel Jones ("Jones"), appeals from his convictions and sentence for aggravated burglary, aggravated robbery, felonious assault, and assault. For the reasons set forth below, we affirm.

{¶2}   In January 2015, Jones and codefendant, Ameer D. Edmonds, Jr. ("Edmonds"), were charged in a nine-count indictment resulting from a home invasion and attack on W.S. and her father, G.S.[1]   Counts 1 and 2 charged Edmonds with the rape of W.S.   Count 3 charged Jones with the rape of W.S.   Counts 4 and 5 charged them both with aggravated burglary.   Counts 6 and 7 charged both of them with aggravated robbery.   Counts 8 and 9 charged both of them with felonious assault.[2]

{¶3}   On June 8, 2015, Edmonds entered into a plea agreement with the state of Ohio, in which he agreed to plead guilty to aggravated burglary and rape.   In exchange, the state dismissed the remaining counts and all of the firearm specifications against him. As part of the plea agreement, Edmonds agreed to testify truthfully in court.   That same day, the charges against Jones proceeded to a jury trial.   The following testimony was presented at trial.

{¶4}   W.S. testified that on December 15, 2014, she lived with her father G.S. on East 75th Street in Cleveland.   That evening, she was in the kitchen preparing food when

_____

[1]As of the date of this opinion, Edmonds has not filed an appeal.

[2]Each of Counts 1-9 included a one- and three- year firearm specification.

she heard a knock at the door. She went to the door and asked who was there. A voice on the other side of the door said "your brother." She knew it was not her brother because it was approximately 1:00 a.m., so she went into her bedroom to look out the window and see who was knocking at her door. She observed two men dressed in black. She immediately knew something was wrong and attempted to call 911, but the men kicked the front door in and entered the house. She then took her phone and threw it under a piece of furniture.

{¶5} Edmonds entered first, and Jones was behind him. Both Edmonds and Jones were wearing hooded sweatshirts and gloves, and both had guns. W.S. recognized Jones immediately because she met him approximately one month prior to the incident. Jones supplied W.S. with $90 worth of marijuana about three weeks earlier and wanted her to sell it. At the time he gave it to her, she did not pay him for it. Rather than sell it, W.S. used it herself. Jones then wanted the $90 from W.S. He constantly brought the issue up with her when they saw each other at Jones's brother's house and when he spoke with her on the telephone. W.S. did not know Edmonds's identity at first, but was eventually able to identify him through social media.

{¶6} W.S. testified that after the two men entered the house, Jones went into her father's bedroom and Edmonds took her into her room. She could hear Jones yelling in the next room. At times, she could hear her father being thrown around his room. While in her bedroom, Edmonds pointed his gun at her and demanded money. She told him she did not have any money. Edmonds told her to lift the couch cushions and go

through all of her clothing to look for money. W.S. was afraid for her life and her father's life, so she offered sex in exchange for the money she owed Jones. She stated that she only offered the sex out of fear, to save her and her father. Edmonds told her to undress and bend over the arm of the couch. Edmonds then had sexual intercourse with W.S. for approximately ten minutes when Jones came into the room.

{¶7} Jones entered and told Edmonds to hurry up. In response, Edmonds told Jones that he was not finished and Jones left the room. At this point, W.S. heard her father in the kitchen being hit and thrown. Edmonds finished, and Jones reentered the room. When Jones reentered the room, he began to threaten W.S., asking her about his money. W.S. testified that she gave him $40 approximately a week earlier, but she needed more time to get Jones the remaining $50. W.S. pleaded with him as he pressed his elbow on her neck and held the gun at her face. Jones told her that he should just shoot her.

{¶8} W.S. offered to have sex with him to calm him down, but Jones declined. Jones stated that she could perform oral sex on him instead. While she was performing oral sex on Jones, Jones threatened W.S. and hit her. At one point, Edmonds entered the room. Jones told him to leave and go watch G.S. Jones stopped after about 15 minutes, and he and Edmonds left the house. W.S. estimated that they were in the house for about 40 minutes. After they left, she went to her sister's house and called 911.

{¶9} Cleveland Police Officer Michael Harper ("Officer Harper") testified that he responded to a call at East 75th Street in Cleveland for a break-in with a possible rape

and pistol whipping. When he arrived, he noticed that the door was kicked in and both W.S. and G.S. were visibly shaken. He spoke with G.S., who had visible injuries to his face, while his partner spoke with W.S. Both G.S. and W.S. were transported to MetroHealth Hospital. At the hospital, W.S. went through a sexual assault exam with a Sexual Assault Nurse Examiner ("SANE").

{¶10} G.S. testified that on the night of the incident, he was awakened by someone ruffling him. He was then hit in the head with a gun and kicked twice in the torso. His assailant, later identified as Jones, dragged him through the doorway and dropped him to the floor. Jones told G.S. that he was upset with him for ignoring his phone calls. At that point G.S. recognized that his assailant was Jones, who was one of W.S.'s friends. G.S. testified that Jones had been to their house before, and he had spoken to Jones on the phone when he has called for W.S.

{¶11} Thereafter, G.S. observed W.S.'s bedroom door open and another male, later identified as Edmonds, exit the room. Edmonds was wearing gloves and holding a gun. Edmonds then stayed with G.S. as Jones went into W.S.'s room. Edmonds asked G.S. if he had any money. G.S. replied "no," but removed some change from his pocket and let it fall on the floor. Edmonds did not take the money. G.S. sat with Edmonds until he went into W.S.'s room and got Jones. The two men then left the house. W.S. exited the room and told G.S. that she was raped.

{¶12} Edmonds testified for the state of Ohio. He explained that he had been charged as a codefendant in this case and described his plea agreement with the state.

Edmonds further testified that he met Jones approximately two or three years prior to this incident. On the night of the incident, he accompanied Jones as Jones was driving around in his car. Jones asked Edmonds to come with him to East 75th Street. They went to G.S.'s house. While at the door, Edmonds heard Jones say, "this is your brother." The door was open and both men walked inside. Edmonds was not sure how the door opened because he was behind Jones. When they entered the house, Jones began asking for money. Edmonds testified that Jones started with G.S., asking him "where's the money at?" Edmonds thought that both people in the house owed Jones money by what was being said to each of them. As he was asking for money, Jones had a gun in his hand. Edmonds watched as Jones hit G.S. with the gun and kick him.

{¶13} Edmonds stated that W.S. was pleading with them to stop because they did not have any money. She then offered to perform oral sex to get them to stop. W.S. preformed oral sex on Edmonds in a bedroom. Edmonds testified that he did not have vaginal sex with W.S. He stopped W.S. before he ejaculated because he could tell that W.S. did not want to perform oral sex, and she seemed afraid. He stated that when they stopped, he left the room and Jones entered the room. W.S. then performed oral sex on Jones. Edmonds was in the kitchen with G.S. as Jones was in the room with W.S. After a few minutes, he went into the bedroom and got Jones. At that moment, Jones grabbed W.S. and threatened to put her in the trunk of his car. Edmonds talked him out of that, and then they left the home.

{¶14} Hristina Lekova ("Lekova"), a Forensic DNA Analyst for the Cuyahoga County Regional Forensic Science Laboratory, testified that she tested the contents of the sexual assault kit collected by the SANE nurse. She found seminal fluid, but was unable to make any scientific conclusions as to whose DNA was present, other than W.S.'s. Lekova further testified that she could neither include or exclude Jones or Edmonds from the DNA analysis.

{¶15} At the conclusion of trial, the jury found Jones not guilty of Count 3 (rape), guilty of Counts 4 and 5 (aggravated burglary), guilty of Counts 6 and 7 (aggravated robbery), and guilty of Count 9 (felonious assault of G.S.). The jury found Jones not guilty of felonious assault as charged in Count 8, but guilty of the lesser included offense — assault. The jury also found Jones guilty of each of the one-year firearm specifications and not guilty of each of three-year firearm specifications.

{¶16} At sentencing, the state conceded that Counts 4 and 5 (both aggravated burglary) merge for purposes of sentencing and elected to proceed on Count 4. The court also merged the firearm specification in Count 9 with Count 7. The court then sentenced Jones to one year in prison on each of the firearm specifications in Counts 4, 6, and 7, to be served prior and consecutive to the base charges, for a total of three years in prison. The court ordered eight years in prison on each of Counts 4, 6, and 7, to be served concurrently, for a total of eight years in prison. The court sentenced Jones to six months in prison on Count 8 to be served concurrently to the other counts, for an aggregate sentence of 11 years in prison.

{¶17} Jones now appeals, raising the following five assignments of error for review.

## Assignment of Error One

The state failed to present sufficient evidence to sustain a conviction against [Jones].

## Assignment of Error Two

[Jones's] conviction is against the manifest weight of the evidence.

## Assignment of Error Three

The trial court committed reversible error when it failed to give the jury the accomplice testimony instruction.

## Assignment of Error Four

[Jones] was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments.

## Assignment of Error Five

The trial court erred in violation of [Jones's] statutory and constitutional rights by imposing a harsher sentence for [Jones] who exercised his right to a jury trial compared with a co-defendant who entered a plea.

## Sufficiency of the Evidence

{¶18} In the first assignment of error, Jones argues the state failed to establish that he was guilty of the crimes for which he was convicted. Specifically, he challenges the aggravated robbery conviction involving G.S.

{¶19} The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the

evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.
>
> In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶20} We are mindful that, in considering the sufficiency of evidence, a certain perspective is required. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978). "This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.*, quoting *Atkins v. State*, 115 Ohio St. 542, 546, 155 N.E. 189 (1926). It is the minds of the jurors, rather than a reviewing court, that must be convinced. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

{¶21} In the instant case, Jones was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that: "[n]o person, in attempting or committing a theft offense * * *shall * * * [h]ave a deadly weapon on or about the offender's person or

under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶22} Jones argues that there was no evidence that he ever demanded any money from G.S. As a result, he contends that he cannot be convicted of aggravated robbery. Jones's argument, however, ignores Edmonds's testimony that he heard Jones demand money from G.S. and hit G.S. in the head with a gun. Jones asked G.S. "where's the money at?" When viewing this evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of aggravated robbery proven beyond a reasonable doubt.

{¶23} Therefore, the first assignment of error is overruled.

## Manifest Weight of the Evidence

{¶24} In the second assignment of error, Jones claims that his aggravated robbery conviction involving G.S. is against the manifest weight of the evidence. In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendants? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72

L.Ed.2d 652.

{¶25} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶26} We note that when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible. *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26; *see also State v. Lilliard*, 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, ¶ 93 (in considering the credibility of witnesses on a manifest weight challenge, an appellate court is "guided by the presumption" that the jury, or the trial court in a bench trial, is "'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984)). Therefore, we afford great deference to the factfinder's determination of witness credibility. *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, ¶ 36.

{¶27} Here, Jones claims the "jury lost its way" because the jury wanted to convict someone besides Edmonds. He further claims there is no credible evidence that Jones committed aggravated robbery as it relates to G.S.

{¶28} While Edmonds may have had an ulterior motive when testifying, the jury observed his appearance and demeanor, heard the testimony about the plea deal he received, and found his testimony to be credible. Moreover, G.S. and W.S. knew Jones and recognized him as the individual who committed the crimes. Thus, we find that the conviction is not against the manifest weight of the evidence. We cannot say that the jury lost its way and created a manifest injustice in convicting Jones.

{¶29} Accordingly, the second assignment of error is overruled.

<u>Jury Instructions</u>

{¶30} In the third assignment of error, Jones argues the trial court failed to instruct the jury on accomplice liability. A review of the record, however, reveals that the trial court did, in fact, instruct the jury on accomplice testimony. The trial court stated:

> Now, I have two additional short matters and you're going to be done hearing my voice for a little bit. First, the testimony of an accomplice. Ameer Edmonds testified claiming to be the accomplice of the defendant, Martrel D. Jones. The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require that it be weighed with great caution.
>
> It is for you, as jurors, in light of all the facts presented to you from the witness stand to evaluate such testimony and to determine its quality and worth or its lack of quality and worth. This is an instruction Ohio law gives any time a witness testifies claiming to be an accomplice.

{¶31} The trial court's instruction was a verbatim recitation of the requirements of R.C. 2929.03(D) as it pertains to accomplice testimony. Moreover, at appellate oral argument, appellant's counsel acknowledged that the trial court gave the proper instruction on accomplice testimony.

{¶32} Accordingly, Jones's argument is unpersuasive, and the third assignment of error is overruled.

## Ineffective Assistance of Counsel

{¶33} In the fourth assignment of error, Jones argues defense counsel was ineffective for failing to request a jury instruction on accomplice testimony. However, as discussed in the previous assignment of error, the trial court did instruct the jury as required by R.C. 2929.03(D).

{¶34} Therefore, we find Jones's argument unpersuasive, and overrule the fourth assignment of error.

## Sentence

{¶35} In the fifth assignment of error, Jones argues the trial court erred when it sentenced him to a greater sentence (11 years in prison) for exercising his right to trial when compared with Edmonds's five-year sentence after entering into a plea.

{¶36} In *State v. Marcum*, Slip Opinion No. 2016-Ohio-1002, the Ohio Supreme Court, in recently "address[ing] the standard of review that appellate courts must apply when reviewing felony sentences," stated that when "[a]pplying the plain language of R.C. 2953.08(G)(2), * * * an appellate court may vacate or modify a felony sentence on

appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.* at ¶ 1.

**{¶37}** Here, Jones's 11-year sentence is within the statutory range for the offenses he committed. Moreover, while R.C. 2929.11(B) requires consistency in sentencing, this "consistency" does not require that codefendants receive equal sentences. *State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418, ¶ 26, citing *State v. Nelson*, 11th Dist. Lake No. 2008-L-072, 2008-Ohio-5535. Instead, an appellate court must examine the record to determine "whether the sentence is so unusual as to be outside the mainstream of local judicial practice. Although the offense may be similar, distinguishing factors may justify dissimilar treatment." *State v. Dawson*, 8th Dist. Cuyahoga No. 86417, 2006-Ohio-1083, ¶ 31, quoting *State v. Turner*, 8th Dist. Cuyahoga No. 81449, 2003-Ohio-4933.

**{¶38}** In reviewing the record, we note that Jones has not provided any evidence that his sentence was a result of him invoking his constitutional right to a jury trial. Jones was convicted of two counts of aggravated burglary, two counts of aggravated robbery, felonious assault, and assault. He was also convicted of several one-year firearm specifications. Whereas, Edmonds pled guilty to one count of aggravated burglary and one count of rape. The evidence demonstrated that Jones was the mastermind behind the home invasion and was sentenced accordingly.

**{¶39}** Therefore, the fifth assignment of error is overruled.

**{¶40}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

TIM McCORMACK, J., and
ANITA LASTER MAYS, J., CONCUR