[Cite as *State v. Jones*, 2025-Ohio-2866.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                   No. 114560

    v.                                       :

ROBERT JONES,                           :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 14, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-688794-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sarah E. Hutnik, Assistant Prosecuting Attorney, *for appellee.*

Mary Catherine Corrigan, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Robert Jones ("Jones") appeals his convictions for felonious assault and having weapons while under disability ("HWWUD"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} This case is about an altercation in which Jones fired a gun at another individual.

{¶ 3} On February 12, 2024, Jones was charged with Count 1, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications pursuant to R.C. 2941.141(A) and R.C. 2941.145(A), and Count 2, HWWUD, a felony of the third degree, in violation of R.C. 2923.13(A)(3).

{¶ 4} On September 18, 2024, the case proceeded to a jury trial. On September 19, 2024, the jury found Jones guilty on all counts. On October 15, 2024, the court imposed a sentence of seven to nine years in prison.

{¶ 5} Jones appealed, raising the following assignments of error:

I. Trial counsel was ineffective for failing to file a motion to suppress.

II. The guilty verdict cannot be upheld because the evidence and testimony presented at trial did not establish the appellant's guilt beyong [sic] a reasonable doubt as to either count.

## II. Trial Testimony

### A. Ricardo Richmond

{¶ 6} Richmond testified that he lives at a "row house" on Hough Avenue ("the House"). On July 20, 2022, Richmond encountered "a good friend of mine," a woman whose name he could not remember, while he was driving from the store to the House. Richmond sometimes employs people to clean the House, which he struggles to do because of past back surgeries. Richmond's friend ("the Woman")

had cleaned for him before, and Richmond offered her "[$]20, $25" to do so again on this day.

{¶ 7}    Richmond and the Woman drove to the House.  When they arrived, the Woman walked to a gate by the parking lot.  Richmond stated that he "barely goes over" to that area because there are a "lot of males hanging out in there . . . smoking and drinking."  The Woman "started talking to a gentleman on the other side" of the gate.  Richmond had "never met him a day in my life.  I never seen him until that day.  Never, ever met him, seen him, laid my eyes on him or nothing."  Meanwhile, Richmond entered the House.

{¶ 8}    A few minutes later, Richmond came out of the house and told the Woman, "'Come on, let's get this job done . . . so you can go, I can go, move on with the . . . rest of my day."  Per Richmond, the man on the other side of the gate then "stood up and . . . told [him], 'You['re] being disrespectful.'"  At this point, Richmond testified, "me and him start having words back to back.  He telling me[,] 'Well, that's my sister, and you disrespecting her.  You ain't going to be disrespecting her.'"

{¶ 9}    After a verbal exchange, the man — whom Richmond later identified as Jones — "hops over the gate and . . . com[es] towards me."  Richmond testified that he and Jones "square off" before Jones "swings at me first."  Richmond retreated from Jones, who came forward towards Richmond.  Richmond tried to reach Jones, at which point Jones "grabbed his gun, pulled it out, shot right at me."  Richmond described the gun as being "all black," a "nine or a .45."  Per Richmond,

Jones "shot once" and missed. At that point, per Richmond, Jones rode away on a bicycle.

{¶ 10} After the shooting, Richmond called the House's rental office and "told them what just happened." Per Richmond, "they already knew. They said they seen it on the camera. There's a camera on the building pointing directly over towards our parking lot." Nobody from the rental office testified, and any footage this camera may have recorded is absent from the record.

{¶ 11} Richmond then called 9-1-1. At trial, the State presented an audio recording of this call. At the beginning of the recording, an automated voice timestamps the call as having occurred at "July 20, 2022, 12:12:46 PM." During the call, Richmond told a 9-1-1 operator that, outside his House, someone had shot at him but missed. Per Richmond, the shooter then rode away on a mountain bike he described as black and either gray or green.[1] Richmond described the shooter as "light-skinned," with "dreads" and wearing a "blue work uniform." Also during the 9-1-1 call, Richmond said that he did not know the identity of the shooter but that "he be over here all the time. I see him all the time." At trial, Richmond stated, "I don't know why I said that . . . because I never met him" prior to the day of the shooting.

{¶ 12} Richmond testified that officers from the Cleveland Division of Police responded to the scene and spoke with him. Per Richmond, these officers searched

[1] Richmond's description of the latter color is unclear in the audio recording.

for a bullet or bullet casing, which they did not find. Richmond stated that he did not remember seeing a bullet or bullet casing, either.

{¶ 13} Richmond and Cleveland Division of Police detective Michael Dunn ("Det. Dunn") spoke about the shooting on several occasions. During one of these conversations, Richmond played for Det. Dunn a "video [of the altercation] that somebody had recorded from the balcony at the building" and sent to Richmond by phone. At trial, Richmond did not identify the videographer, and the videographer did not testify.

{¶ 14} Later, a Cleveland Division of Police detective administered to Richmond a photo lineup. Richmond testified that he was asked to identify anybody that he knew from the incident. Richmond circled a photo of Jones. He also identified Jones in the courtroom as the shooter.

**B. Dennison Crowell**

{¶ 15} Dennison Crowell ("Officer Crowell") testified that he is a police officer for the Cleveland Division of Police and that he responded to Richmond's House on July 20, 2022 to investigate a shooting. Officer Crowell spoke to Richmond and searched for physical evidence, including a bullet or shell casing, neither of which he found.

**C. Stevie Green**

{¶ 16} Stevie Green ("Officer Green") testified that he is a police officer for the Cleveland Division of Police and that he responded to the House on July 20, 2022, to investigate a shooting. Officer Green stated that Richmond "was kind of

shooken [sic] up so it was obvious that something had occurred." Officer Green spoke to Richmond and searched for physical evidence, including a bullet or shell casing, neither of which he found. As for whether it was unusual not to find these items at the scene of a discharged firearm, Officer Green stated, "[S]ometimes you can, sometimes you can't," in part because "it's difficult to locate such a small thing."

**D. Det. Dunn**

{¶ 17} Det. Dunn testified that he is a detective for the Cleveland Division of Police and that he investigated this shooting. Det. Dunn accessed video recorded by a Real-Time Crime Center camera ("RTCC camera") located near Richmond's House. RTCC cameras are placed throughout Cleveland to record video for the purpose of helping law enforcement solve crimes. Det. Dunn testified regarding RTCC camera footage captured near the House, timestamped 12:10 and dated July 20, 2022. The footage showed "people" and "movement in [the] area . . . where our incident would have occurred." The video also showed a male riding a bicycle that is black and blue away from the House. Per Det. Dunn, the man on the bicycle "looks like the described individual," meaning a "brown-skinned male with dreadlocks and a blue . . . jumpsuit."

{¶ 18} Det. Dunn also stated that he spoke with Richmond several times during his investigation, by phone and in person. During an in-person conversation, Richmond used his phone to play for Det. Dunn a video that Richmond claimed one of his neighbors recorded of the incident. The neighbor purportedly sent this video

to Richmond. Det. Dunn's body camera captured the video as Richmond played it using his phone.

{¶ 19} The body-camera footage of the phone recording showed two people, who are Black, moving in a circle and raising their fists, as though about to fight. Two other people, who are also Black, are standing nearby. At no point in the video does either person swing at the other. Eventually, the camera cuts away from the men, showing only cars. At that point, a loud noise is audible. Det. Dunn testified that this sound was consistent with a gunshot. No gun is visible in the video.

{¶ 20} Det. Dunn testified that, per Richmond, "one of his friends from the neighborhood [was] able to advise him that the suspect's first name was Robert and that he also is known to work at the Karamu House." Det. Dunn went to Karamu House to investigate. There, Det. Dunn found and photographed a mountain bike that was black and blue. Det. Dunn also encountered and spoke to Jones. Det. Dunn's body camera captured this conversation.

{¶ 21} The body-camera footage shows that Det. Dunn spoke through a police car window to a black man who identified himself as "Robert Jones." The footage begins with Jones approaching the passenger side of the vehicle, and Det. Dunn asking, "What's going on brother?" and "What's your name?" The video does not include any events that lead up to Jones approaching the vehicle.

{¶ 22} After Jones identified himself, Det. Dunn exited the car. For the rest of the video, Det. Dunn stood with his back to the car's front-passenger seat, facing Jones. Another police officer stood to Jones's left, at points leaning against the rear

bumper of the car. Det. Dunn then informed Jones that he was investigating a fight and an alleged firearm discharge. Jones denied knowing about the shooting but stated that he remembered "fighting somebody" or that "somebody swung on me." Det. Dunn then asked if Jones's sister was involved. Jones said that she was. Then, Det. Dunn read Jones his rights; in response, Jones asked for an attorney.

{¶ 23} After requesting an attorney, Jones continued to speak about the incident. In relevant part, Jones stated, "It was him disrespecting me, talking crazy to me." Jones also said, "I basically . . . hopped on my bike and rode away," because "I heard somebody called the police." Jones continued, "I said, 'What for?' Somebody discharged a firearm, ain't nobody shoot at nobody." Jones further provided that his mother had lived near Richmond's House for years and that her neighbors knew him because he checked on her often. Finally, Jones stated that the man he fought "pushed me so . . . we 'bout to fight." Jones mimicked raising his fists while recounting these events to Det. Dunn.

{¶ 24} While Jones spoke, Det. Dunn stated, "I get a report. I just have to follow up." Det. Dunn was otherwise silent. After Jones finished speaking, Det. Dunn reiterated, "If you don't want to talk to me about it, I respect that right." Det. Dunn then asked for Jones's contact information. Det. Dunn wrote down Jones's phone numbers, gave Jones his business card, and returned to his vehicle.

{¶ 25} Later, Det. Dunn generated a "blind photo lineup" using the Ohio Law Enforcement Gateway, an online network. Jones's Ohio Bureau of Motor Vehicles ("OBMV") photo was placed alongside OBMV photos that showed people of similar

height, weight, age, and skin color.  Det. Dunn gave the photo lineup to a detective that had not been assigned to investigate this case.  Det. Dunn stated he did not tell the detective which of the photographed individuals he suspected to be the shooter.  The detective administered the photo lineup to Richmond.  The identifying information of the individuals in the photo lineup was not provided to Richmond.  Richmond selected the photo of Robert Jones, who he believed shot at him.

{¶ 26} On cross-examination, Det. Dunn admitted that he could not verify that the video Richmond received from a neighbor was recorded on July 20, 2022.  Det. Dunn also admitted that he did not talk to the neighbor who purportedly recorded the video or any of the other individuals visible in the video.  Det. Dunn admitted a gun is not visible in the video.

{¶ 27} Also on cross-examination, Det. Dunn addressed the lack of physical evidence discovered at the House.  Det. Dunn stated, after being fired, a bullet "could ricochet, it could skip, it could go a million different places . . . ."  Det. Dunn also stated that a shell casing "[c]ould have went many different places," after a firearm discharge, depending on the type of firearm, caliber of bullet, and "where the person's pointing" the firearm.

## III. Law and Analysis

### A. Assignment of Error No. I — Ineffective Assistance of Counsel

{¶ 28} In his first assignment of error, Jones asserts that his attorney provided ineffective assistance of counsel by not moving to suppress parts of Det. Dunn's body-camera footage.  Jones argues that, in the video of his conversation

with Det. Dunn at Karamu House, Jones made self-incriminating statements during a custodial interrogation before Det. Dunn informed him of his rights against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966). Had trial counsel moved to suppress this video, Jones argues, the court would have excluded it from the record, which would have changed the outcome of the trial. We disagree.

{¶ 29} "To establish ineffective assistance of counsel, a defendant must show his attorney was deficient — made errors so serious that he was not functioning as 'counsel' guaranteed by the Sixth Amendment — and that these errors prejudiced the defense — deprived defendant of a fair trial." *State v. Newberry*, 2025-Ohio-2004, ¶ 28 (8th Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for the counsel's errors, the result of the trial would have been different." *State v. Bradley* 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶ 30} Failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel. *State v. Sanchez*, 2016-Ohio-3167, ¶ 10 (8th Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). To establish ineffective trial counsel in this context, the record must demonstrate that "the motion would have been granted." *Sanchez* at ¶ 10.

{¶ 31} To establish whether Jones's hypothetical motion to suppress would have been granted, we must decide whether, in Det. Dunn's body-camera footage, Jones made self-incriminating statements during a custodial interrogation before

law enforcement rendered *Miranda* warnings. A defendant's self-incriminating statements during a custodial interrogation are inadmissible unless law enforcement has informed the defendant of his *Miranda* rights, including the right to remain silent. *State v. Nieves*, 2022-Ohio-3040, ¶ 22 (8th Dist.), citing *Miranda*, 384 U.S. 436.

{¶ 32} A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. The determination of whether a custodial interrogation has occurred turns on "'how a reasonable man in the suspect's position would have understood his situation.'" *State v. Farris*, 2006-Ohio-3255, ¶ 14, quoting *Berkemer v. McCarty*, 468 U.S. 420, 444 (1984). An individual is in "custody" for Miranda purposes if, "under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave." *State v. Griffith*, 2012-Ohio-2628, ¶ 18 (8th Dist.), citing *Yarborough v. Alvarado*, 541 U.S. 652, 664-665 (2004). "'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Hall*, 2014-Ohio-1731, ¶ 13 (8th Dist.), citing *State v. Strozier*, 2007-Ohio-4575, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980).

{¶ 33} A suspect who volunteers information without being asked questions is not subject to a custodial interrogation and is not entitled to *Miranda*

warnings. *State v. McGuire,* 80 Ohio St.3d 390, 401 (1997). In other words, "*Miranda* does not affect the admissibility of 'volunteered statements of any kind.'" *Id.,* quoting *Miranda* at 478.

{¶ 34} We find that, after Det. Dunn read Jones his *Miranda* rights and Jones asked for an attorney, all of Jones's statements about the altercation with Richmond were voluntary. Det. Dunn did not elicit communication from Jones. Det. Dunn did not ask Jones questions regarding the altercation or tell Jones to recount what had happened. Det. Dunn spoke only to explain why he was speaking with Jones, stating, "I get a report. I just have to follow up." After Jones finished speaking, Det. Dunn reiterated, "If you don't want to talk to me about it, I respect that right." Det. Dunn then asked for Jones's contact information.

{¶ 35} Det. Dunn also did not take any actions that he should have known would elicit an incriminating response from Jones. Except when Det. Dunn explained that he was required to follow up with Jones, Det. Dunn stood silently while Jones was speaking. Det. Dunn otherwise acted only to write down Jones's phone numbers, give Jones his business card, and return to his vehicle. The statements Jones made after requesting a lawyer were voluntary and, therefore, not subject to suppression.

{¶ 36} We turn next to the statements Jones made before Det. Dunn read him his *Miranda* rights. Some of these statements are immaterial because Jones repeated them voluntarily after asking for a lawyer. Before being informed of his *Miranda* rights, Jones admitted to having been in a fight, stating, "I remember

fighting somebody . . . somebody swung on me." After requesting a lawyer, Jones again stated, "He pushed me so . . . we 'bout to fight." Again, Det. Dunn said nothing and did nothing that prompted Jones to begin talking. Because Jones made the latter statement voluntarily, there would not have been legal grounds to exclude it at trial.

{¶ 37} The only potentially self-incriminating statement that Jones made before Det. Dunn read him his *Miranda* rights but did not repeat after being Mirandized was that he saw and spoke to his sister before the fight. These statements were relevant in conjunction with Richmond's claim that the man he fought and who fired a gun was talking with that man's sister beforehand. Jones's admission of this fact helped establish the shooter's identity.

{¶ 38} However, a defendant does not establish trial counsel was ineffective for failure to move to suppress statements that, even if excludable, are cumulative of information established by other evidence. *State v. Spaulding*, 2016-Ohio-8126, ¶ 96 (finding defendant did not "satisfy *Strickland*'s second prong" of prejudice regarding "statements that revealed aspects of his criminal history" because "the jury learned about [defendant's] criminal history from numerous sources, including his other statements to police"). The record contains other evidence that Jones was the shooter, such that Jones did not demonstrate that counsel's failure to move to suppress his statement regarding his pre-fight conversation with his sister would have affected the trial.

{¶ 39} The shooter's identity is established by Richmond's selection of Jones's picture during the blind photo lineup. Richmond also identified Jones in the courtroom as the shooter.

{¶ 40} The RTCC footage shows a Black man riding a bicycle away from the House two minutes before Richmond's 9-1-1 call. The bicyclist is wearing clothing that matches Richmond's description of the shooter's clothes during the 9-1-1 call. During his conversation with Det. Dunn, Jones admits that, after the altercation, he "hopped on [his] bike and rode away." This evidence, taken together, supports that Jones was the individual who engaged with Richmond.

{¶ 41} Further, the bicycle in the RTCC footage is black and blue, as was the bicycle at Karamu House. Although Richmond described the shooter's bicycle as black and green or gray during the 9-1-1 call, the jury was free to find that the photo and video evidence to the contrary outweighed Richmond's recollection on this issue of fact.

{¶ 42} Because Jones's statements about seeing his sister before the fight were cumulative evidence of the shooter's identity, Jones has not demonstrated that excluding them would have impacted the outcome of the trial.

{¶ 43} Accordingly, assignment of error No. 1 is overruled.

**B. Assignment of Error No. II — Manifest Weight of the Evidence**

{¶ 44} Jones's second assignment of error asserts that his conviction was against the manifest weight of the evidence. A manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether

the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, quoting *Thompkins* at 387, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 45} In a manifest-weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

### 1. Felonious Assault

{¶ 46} The manifest weight of the evidence supports Jones's conviction for Count 1, felonious assault. The State showed that Jones knowingly attempted to cause physical harm to another using a deadly weapon, as required to support a conviction under R.C. 2903.11(A)(2).

{¶ 47} Jones did not testify or otherwise submit evidence for the court to weigh against the State's evidence. Therefore, our manifest-weight analysis turns largely on the testifying victim's credibility. Ohio courts consistently hold that the factfinder is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part or none of each witnesses' testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.).

{¶ 48} Having reviewed the record, we cannot say the jury clearly lost its way in convicting Jones for this offense. None of the evidence precludes a reasonable jury from finding credible Richmond's testimony and assertion during the 9-1-1 call that someone shot at him. In the video of the altercation that a neighbor purportedly recorded, a loud noise is audible. Det. Dunn testified that this sound was consistent with a gunshot.

{¶ 49} Regarding the fact that Cleveland Police discovered no bullet or casing at the scene, Det. Dunn stated that a bullet could "ricochet . . . a million

different places." Further, Officer Green stated that law enforcement cannot always find bullets and bullet casings at the scene of a firearm discharge because these items are small and hard to locate.

{¶ 50} Jones's statements, captured in Det. Dunn's body-camera footage, also do not preclude a reasonable jury from finding that someone shot at Richmond. In relevant part, Jones states, "I heard somebody called the police." Jones continues, "I said, 'What for?' Somebody discharged a firearm, ain't nobody shoot at nobody." This statement is ambiguous. It is not clear whether Jones is admitting to Det. Dunn that someone fired a gun but denying that the gun was aimed at any particular person or is reenacting a conversation in which he denied altogether an unnamed bystander's assertion that a gun was fired. Regardless, it was the jury's prerogative to believe Richmond's version of events instead of Jones's and conclude that someone shot at Richmond.

{¶ 51} The record also does not preclude a reasonable jury from determining that the shooter was Jones. As discussed above, Jones's statements to Det. Dunn about seeing his sister, in conjunction with Richmond's claim that the man who fought and fired a gun at him was interacting with his sister beforehand, support this conclusion.

{¶ 52} That Jones is the person who fired the gun is also established by Richmond's selection of Jones's picture during the blind photo lineup and Richmond's courtroom identification of Jones as the shooter. Further, the RTCC footage showing a bicyclist wearing clothes that match Richmond's description in

the 9-1-1 call, taken together with Jones's admission that he "hopped on [his] bike and rode away" after the altercation also establish that he was the shooter.

{¶ 53} Lastly, Det. Dunn photographed a black and blue bicycle at Karamu House, where he spoke to Jones. This matches the colors of the bicycle in the RTCC footage. Again, although Richmond described the shooter's bicycle as black and green or gray during the 9-1-1 call, the jury was free conclude otherwise based on the photo and video evidence to the contrary.

{¶ 54} Given the foregoing, we cannot say that the jury lost its way in determining that Jones discharged a firearm at Richmond and convicting him for felonious assault under R.C. 2903.11(A)(2).

## 2. Having Weapons While Under Disability

{¶ 55} The manifest weight of the evidence also supported a conviction under R.C. 2923.13(A)(3). For the reasons stated above, the State demonstrated that Jones had or carried a firearm, as required to convict Jones for Count 2, HWWUD. Nothing in the record indicates that, in doing so, the factfinder clearly lost its way in finding Jones guilty of this offense.

{¶ 56} Accordingly, assignment of error No. 2 is overruled.

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)