[Cite as *State v. Webb*, 2026-Ohio-1868.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                         No. 115674

    v.                                   :

JIYON WEBB,                             :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 21, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696836-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary Lafleur, Assistant Prosecuting Attorney, *for appellee*.

Clarissa A. Smith and Brandon Summers, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant Jiyon Webb ("Webb") appeals his multiple convictions, which were rendered after a bench trial. Finding no merit to the appeal, we affirm.

{¶ 2} Webb was charged in an 11-count indictment with two counts of aggravated robbery, six counts of robbery, two counts of attempted grand theft of a motor vehicle, and one count of obstructing official business. All counts except for obstructing official business had one- and three-year firearm specifications.

{¶ 3} The following pertinent facts were presented at trial.

{¶ 4} On August 7, 2024, Cleveland police officer Sheldon Brown ("Officer Brown") received a report of an attempted carjacking in the area of East 149th Street and Glendale Avenue in Cleveland. It was reported that there were four to six males involved and one of them was possibly wearing a white ski mask. Shortly thereafter, Officer Brown received another report that four to six males had attempted to carjack someone else, a fellow officer, Detective Timothy Hannon ("Detective Hannon), around East 140th Street and Glendale Avenue. Officer Brown immediately drove to the area where he and his partner saw the suspects. He told the males to get to the ground, but they took off running in different directions. Officer Brown chased one male, whom he was able to apprehend. That male had on black clothes and was carrying a gray ski mask. Officer Brown was wearing his department-issued body camera, which was introduced into evidence at trial.

{¶ 5} Detective Colbert Stadden ("Detective Stadden") also responded to the scene. He was also wearing his body camera, which was introduced into evidence. When Detective Stadden began chasing the males, he observed one male, whom he described as tall and thin, drop what appeared to be a gun in a vacant lot. Detective Stadden also assisted in Webb's arrest. Webb was not the same male Detective

Stadden had observed dropping the weapon. The firearm that had been dropped was recovered and determined to be a Glock 17 BB gun. Detective Stadden testified that the gun had the same weight and color as his service weapon and had he seen the gun without picking it up or touching it, he would have believed it to be a functional firearm.

{¶ 6} Detective Hannon, a 13-year veteran of the Cleveland Police Department assigned to the FBI task force, testified that he was working in an unmarked FBI car on the night in question. He heard the initial carjacking call come over the radio with a description of the suspects and their clothing and decided to drive to that area to see if he could spot the suspects. He was wearing a body camera, which he initially did not have on because he was only going to serve as a spotter, assisting other officers in apprehending the suspects.

{¶ 7} Detective Hannon was crossing East 140th Street when he observed a male standing in the middle of the street. He twice tried to steer his vehicle away from the male, but the male moved in his same direction both times, as to block his path. Detective Hannon then observed four to five males approach his car from the tree line. He observed the males lift their shirts and specifically saw Webb grab a gun and pull it out of his waistband. He noted that the males' clothing matched the description of the clothing the males from the first attempted robbery had been wearing; Webb was wearing a multicolored sweatshirt. Detective Hannon "gunned" his vehicle and drove away but ultimately turned around and assisted in the arrest of one of the males. (Tr. 70.)

{¶ 8} During his testimony, Detective Hannon remembered Webb's distinctive sweatshirt and thought that Webb was wearing "something white" around his face, "a white mask or some sort of towel." (Tr. 78.)

{¶ 9} Detective Demetrius Madison also responded to the scene, and his body camera was introduced into evidence.  He spoke with Webb after his arrest, who told the detective that he had been in the area to get a hammer to fix his game console.  Webb consented to a search of his mobile phone.  Police recovered several text messages related to the robbery.  The first series of texts occurred on August 5, 2024, two nights before the incident.  Webb texted to someone, "Tay told you he got [a] play." (Tr. 99.)  That person responded, "He tryna rob uh white n*** . . . .  We don't got the pole." (T. 99-100.)  Based on his training and experience, Detective Madison understood "play" to reference a robbery and "pole" to mean a gun.  The next day that same person texted Webb, "he got one . . . .  He reach, he dying." (Tr. 101.)  Detective Madison understood the conversation to mean that if the person they were going to rob reached for a gun, they planned to shoot that person.  Later in that same conversation, Webb confirmed, "We got one." (Tr. 102.)

{¶ 10} On August 7, 2024, the day of the robbery, Webb texted to someone "Needa use yo hammer." (Tr. 104.)  Based on his experience, Detective Madison understood a "hammer" to mean a firearm.  Police also found internet searches for Glock handguns, which had been on Webb's mobile phone the day after the robbery.

{¶ 11} While in jail, Webb spoke with his mother and discussed the police having text messages from his phone.  On the same call, his mother indicated that

she had spoken to another individual involved, stating that that person "didn't say anything about you having a gun and I didn't understand the plan anyway." (Tr. 110.)  On another call with his mother, Webb said, "I have text messages and stuff . . . [f]rom a few days prior we were just talking about it." (Tr. 111.)  On a third call, with a friend, Webb said the police had found a BB gun and asked, "Did they find it or did they find it on someone?"  (Tr. 112.)  During the same conversation, Webb asked if "they" found that "one thing" and the friend responded, "Two people just walked away." *Id.*  The friend stated that he dropped "it" and "they're never going to find it." *Id.*

{¶ 12} The trial court convicted Webb of one count of aggravated robbery with one- and three-year gun specifications, three counts of robbery with one- and three-year gun specifications, attempted grand theft of a motor vehicle with one- and three-year gun specifications, and obstructing official business.  The court sentenced Webb to a total of nine to ten and one-half years in prison.

{¶ 13} Webb appealed, raising three assignments of error for our review:

I.  Appellant's conviction must be reversed where the State of Ohio failed to present sufficient evidence to support the convictions.

II.  Appellant's convictions are against the manifest weight of the evidence.

III.  Appellant's convictions were due to the ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution.

{¶ 14} In the first assignment of error, Webb contends that the State failed to provide sufficient evidence to support his convictions for aggravated robbery,

robbery, attempted grand theft of a motor vehicle, or the firearm specifications.[1]  In the second assignment of error, he claims that these same convictions are against the manifest weight of the evidence.

{¶ 15} Sufficiency and manifest weight are different legal concepts.  However, manifest weight of the evidence may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily disposes of the issue of sufficiency.  *Cleveland v. Brown*, 2026-Ohio-1046, ¶ 17 (8th Dist.), citing *State v. Jackson*, 2015-Ohio-1946 (8th Dist.).

{¶ 16} When reviewing a bench-trial verdict — where the trial court serves as the factfinder in lieu of a jury — an appellate court will not reverse a conviction so long as the trial court could reasonably conclude from substantial evidence that the prosecution proved the offense beyond a reasonable doubt.  *Brown* at ¶ 18, citing *State v. Hughes-Davis*, 2025-Ohio-3151 (8th Dist.).

{¶ 17} In *Brown*, this court noted that in order

> "to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*Brown* at *id.*, quoting *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.).

---

[1] Webb does not challenge his conviction for obstructing official business; therefore, we summarily affirm that conviction.

{¶ 18} "A manifest weight challenge should be sustained 'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Brown* at ¶ 19, quoting *State v. Nicholson*, 2024-Ohio-604, ¶ 71.

{¶ 19} When conducting a review under a manifest-weight challenge, we are mindful of the presumption in favor of the finder of fact and "'[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Brown* at ¶ 20, quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 14. "The finder of fact is in the 'best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony.'" *Brown* at *id.*, quoting *State v. Jones*, 2025-Ohio-2866, ¶ 47 (8th Dist.).

{¶ 20} Webb contends that the State failed to show that a deadly weapon was used in the commission of the offense and, therefore, he should not have been convicted of the firearm specifications.

{¶ 21} To establish a firearm specification, the State must prove that "the offender possessed a weapon that was capable of firing a projectile by means of an explosive or combustible propellant and was operable or could readily have been rendered operable at the time of the offense." *State v. Jeffers*, 143 Ohio App.3d 91, 94 (1st Dist. 2001). R.C. 2923.11(B)(2)(a) provides that, in determining whether a weapon is capable of expelling a projectile, "the trier of fact may rely on

circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."

{¶ 22} Ohio "case law supports conviction when a defendant flashes what appears to be a gun, even if it is never proved to be a gun or to be operable." *State v. Watkins*, 2004-Ohio-6908, ¶ 17 (8th Dist.), citing *State v. Dixon*, 71 Ohio St.3d 608 (1995). "[A] victim's belief that the weapon is a gun, together with the defendant's intent to create and use the victim's belief for the defendant's own criminal purposes, is sufficient to prove a firearm specification." *State v. Lilliard*, 2013-Ohio-4906, ¶ 88 (8th Dist.). In *Jeffers*, the court upheld firearm-specification convictions even though the victim never saw the defendant with a weapon because the defendant concealed his hand in his pocket, which indicated possession of a firearm, and threatened to "blow" the victim's "head off." *Id*. at 95; s*ee also State v. Obsaint*, 2007-Ohio-2661 (1st Dist.) (defendant's written admission that he had a gun, in a note that made repeated references to shooting the teller, was sufficient circumstantial evidence to show that he possessed an operable firearm); *State v. Cummings*, 2018-Ohio-4214 (8th Dist.) (defendant's ordering the victim to empty his pockets while placing a gun to the victim's chest was sufficient to establish its operability).

{¶ 23} It has long been held that

A firearm penalty-enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and

circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm.

*State v. Thompkins*, 78 Ohio St.3d 380, 385 (1997).

{¶ 24} Again, actions, regardless of words, can establish firearm operability. "[A]ctions alone, without verbal threats, may be sufficient circumstances to establish operability of a firearm." *State v. Reynolds*, 79 Ohio St.3d 158 (1997).

{¶ 25} There was ample evidence presented at trial to support Webb's convictions on the firearm specifications. Detective Hannon was responding to an initial attempted carjacking call when a male in the street attempted to block his car from moving. While the male attempted to block his path of travel, Detective Hannon observed four to five males come out from behind a tree line. The males were positioned in such a way that Detective Hannon was unable to see them until they approached his vehicle. Detective Hannon, an experienced law enforcement detective, specifically noted Webb pulling a gun out of his waistband. Webb's action in approaching Detective Hannon's vehicle while pulling the gun out of his waistband is indicative of Webb's intent to use a firearm and to establish its operability.

{¶ 26} Moreover, Webb's intent to commit a robbery with a gun was shown through his text messages, jailhouse phone calls, and statements to Detective Madison. Webb told Detective Madison that he was out that evening because "he contacted a family member or a friend. He needed to get a hammer to fix his game console. That's why he was in the area that night we started chasing everyone."

(Tr. 97.) Before the crime occurred, Webb texted with a friend discussing that he "Needa use yo hammer" and that they needed a "pole." (Tr. 100 and 104.) Based on his experience, Detective Madison understood "hammer" and "pole" to mean a firearm. Additionally, in the lead up to the incident, Webb and his friend discussed specifically robbing a "white n***," stating if "he reach, he dying." (Tr. 99-101.)

{¶ 27} On a jail call, Webb said, "I have text messages and stuff . . . . From a few days prior we were just talking about it." (Tr. 111.) On another call, Webb asked a friend if the police found that "one thing" and the friend responded, "Two people just walked away . . . they're never going to find it," which could indicate that the police would never recover the second firearm. (Tr. 112.)

{¶ 28} Webb also argues that the State failed to prove the offenses of aggravated robbery, robbery, and attempted grand theft of a motor vehicle. Webb challenges his identification and argues that the State failed to establish that he possessed a firearm at the time of the offense or that he committed an overt act in furtherance of the robbery.

{¶ 29} Detective Hannon identified Webb as the individual he saw with a firearm that evening. He saw Webb pull his shirt up and "saw the handle of the gun and I saw him pulling it, pulling it up. That was the extent of what I saw was him pulling it out of the pants and then I saw the frame of the gun." (Tr. 77.) Detective Hannon distinctly remembered Webb's colorful sweatshirt; Webb was the only suspect wearing a distinctive colored hoodie. Detective Hannon also spoke to Webb following his arrest and identified him in court.

{¶ 30} As to possession, Webb suggests that the fact that the BB gun was dropped by another male during the chase belies the fact that Detective Hannon saw Webb with a gun; however, both can be true. Testimony from the State's witnesses established that there were multiple males and multiple weapons involved in the robbery. Again, Detective Hannon saw Webb pulling a gun out of his waistband and Detective Stadden saw a male that was not Webb discard a gun in a vacant lot. Moreover, we have already found that the State established that Webb was carrying a firearm during the incident, and the State is not required to produce the actual weapon in order to secure a conviction for aggravated robbery. *State v. Vondenberg*, 61 Ohio St.2d 285, 288-289 (1980).

{¶ 31} With respect to an "attempt" to commit a crime, "the Ohio Supreme Court has classified an attempt as occurring 'when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.'" *State v. LeDlow*, 2024-Ohio-2912, ¶ 20 (8th Dist.), quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus. "A 'substantial step' must be 'strongly corroborative of the actor's criminal purpose.'" *Woods* at *id.* "Precisely what conduct will be held to be a substantial step must be determined by evaluating the facts and circumstances of each particular case." *State v. Butler*, 2012-Ohio-5030, ¶ 28 (5th Dist.).

{¶ 32} Webb argues there was no substantial step that indicated that he intended to commit a robbery or steal Detective Hannon's vehicle. The evidence

presented at trial belies this contention. Webb engaged in a coordinated effort to steal Detective Hannon's vehicle — one male tried to block his vehicle while Webb and others approached the vehicle, and Webb pulled a gun from his waistband.

{¶ 33} Finally, Webb argues the issue of the date of the internet searches for firearms, noting that his online search for information on Glocks came after his arrest. However, there is no evidence that these internet searches played a role in the trial court's finding of guilt. The trial court provided an elaborate explanation of its finding of guilt, detailing the pieces of evidence that led to its determination. In its explanation, the court did not mention the web searches.

{¶ 34} We find that Webb's convictions were supported by the manifest weight of the evidence and, therefore, that the evidence was sufficient to support his convictions.

{¶ 35} The first and second assignments of error are overruled.

{¶ 36} In the third assignment of error, Webb argues that he was denied effective assistance of trial counsel.

{¶ 37} In order to establish a claim of ineffective assistance of counsel, the defendant must show that his or her trial counsel's performance was deficient in some aspect of his or her representation and that deficiency prejudiced his or her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Pursuant to *Strickland*, our assessment of an attorney's representation must be highly deferential and we are to indulge "a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Id*. at 689. In Ohio, every

properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985).

{¶ 38} "Prejudice is established by showing that but for the unreasonable error there is a reasonable probability that the results of the proceeding would have been different." *State v. Fortson*, 2001 Ohio App. LEXIS 5576 (8th Dist. Dec. 11, 2001). "A 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.'" *State v. Khoshknabi*, 2018-Ohio-1752, ¶ 29 (8th Dist.), quoting *Strickland* at 694.

{¶ 39} Webb contends that his trial counsel was ineffective because counsel's Crim.R. 29 motion for dismissal did not include all counts and because counsel failed to introduce the transcript from his codefendants' juvenile hearing.

{¶ 40} Counsel for Webb did not mention Count 11, obstructing official business, in his oral motion to dismiss pursuant to Crim.R. 29. On appeal, counsel argues that had trial counsel argued for dismissal of that count, there was a "strong likelihood" that the trial court would have dismissed it because there was insufficient evidence to support his conviction. However, as previously mentioned, Webb did not challenge the sufficiency of the evidence as to Count 11, nor does he support his current argument with any citations to the record or authorities or explain how there was a strong likelihood the trial court would have dismissed the count. We decline to make Webb's arguments for him.

**{¶ 41}** Webb also contends that had trial counsel introduced the transcript from Webb's codefendant's juvenile hearing into evidence, the outcome would have been different because there were inconsistencies in Detective Hannon's testimony. The contested testimony dealt with the detective's description of what Webb was wearing on his head and face during the incident. We agree with the trial court that his testimony was substantially consistent; any discrepancy was not so great as to render counsel ineffective. Trial counsel had the opportunity, which he took, to cross-examine Detective Hannon about any discrepancies in the transcripts.

**{¶ 42}** The third assignment of error is overruled.

**{¶ 43}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY J. BOYLE, P.J., and
DEENA R. CALABRESE, J., CONCUR